UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEAH PALMER, | Case No. 16-CV-0672 (PJS/JSM) |
| Plaintiff, | |
| v. | ORDER |
| THE COUNTY OF ANOKA, a Minnesota Municipal Corporation; and ANTHONY PALUMBO, in his individual and official capacity, | |
| Defendants. | |

Jenny M. Helling and John A. Fabian, III, FABIAN MAY & ANDERSON, for plaintiff.

Andrew T. Jackola and Bryan D. Frantz, ANOKA COUNTY ATTORNEY'S OFFICE, for defendants.

Defendant Anthony Palumbo is the Anoka County Attorney. Among his most important responsibilities is representing Anoka County Sheriff James Stuart and his deputies in judicial proceedings. Both Palumbo and Sheriff Stuart are elected officials.

Palumbo hired plaintiff Leah Palmer to serve as his spokesperson. Among her most important responsibilities were representing Palumbo in the community and serving as a liaison between Palumbo, on the one hand, and Sheriff Stuart and other law-enforcement officers, on the other hand.

A few months after she was hired, Palmer wrote a Facebook post that accused police officers of sanctioning homicide and harshly attacked the Republican party. This

post angered Sheriff Stuart and some of his deputies. Palmer was verbally reprimanded by Palumbo and instructed to follow the social-media policy of the Anoka County Attorney's Office ("Office"). That policy prohibits employees from posting comments that might embarrass the Office or harm its work.

The reprimand did not have much of an impact. Less than two months later, Palmer wrote another Facebook post in which she acknowledged that she was "not supposed to talk politics anymore," but nevertheless endorsed the views expressed in an article to which she linked. That article also criticized police officers and, among other things, accused the Republican party of subjecting African-Americans to conditions that were "just as harmful" as hundreds of years of slavery. After becoming aware of Palmer's second incendiary Facebook post in as many months, Palumbo terminated her as his spokesperson.

Palmer now sues Palumbo and Anoka County, bringing a federal claim for violation of her First Amendment rights and a state claim for age discrimination. Defendants have moved to dismiss. For the reasons that follow, the Court dismisses Palmer's First Amendment claim and declines to exercise supplemental jurisdiction over her age-discrimination claim.

I.  FACTS

Palmer began working as the Community Relations Coordinator for the Anoka County Attorney's Office on December 29, 2014.  Palmer's job duties included communicating on the Office's behalf to community leaders, the media, and the public.  Shortly after Palmer was hired, she told Palumbo that she frequently used social media.  She offered to stop posting altogether on Facebook, but Palumbo told her that was not necessary.  Palmer performed well in her role and received no negative feedback until April 28, 2015.

On that date, Palumbo met with Palmer about a message that she had posted on her personal Facebook page.  The post reads:

> To my conservative friends decrying the violent riots in #Baltimore:
>
> We live in a violent society:
>
> The NRA says so—it's one of their main tenants [sic] to supporting (read: pushing) conceal/carry and open carry laws.
>
> We answer global violence with war and when we don't, John McCain yells and stomps, and Ted Cruz says diplomacy is a waste of time.
>
> Violence is okay in movies like Divergent, The Hunger Games[,] Transformers, and other PG-13 movies.  But, if you throw sex in there, forget your PG-13 rating; it's R.  That sh*t's not for kids, you know.  (?!)

> Call of Duty is not just for your average teenager and his X-Box. It's also for training our soldiers.
>
> The US spends 20 cents of every tax dollar on military and just 2 cents on education. You do the math.
>
> So when youth in Baltimore who live in worse conditions than youth in Nigeria, finally break down in the face of police-sanctioned HOMICIDE, is anyone surprised that violence is the result??? According to the GOP that's just business as usual in every other part of our society.

Compl. ¶ 11.

Palmer admitted to Palumbo that she had written the post. Palumbo told Palmer that her post was "not okay" and showed her, for the first time, the Office's social-media policy. Compl. ¶ 12. Among other things, the policy prohibited employees from "[p]osting comments that have the potential for causing embarrassment to the Office [or] disruption in the workplace, or that otherwise detrimentally affect the office's reputation or the work that [it does]." Compl. ¶ 12.

Palumbo explained to Palmer that Sheriff Stuart was offended by her Facebook post and had left Palumbo a voicemail stating that he did not want Palmer in his office if she had such an attitude toward police. Palumbo told Palmer that Sheriff Stuart "is prone to emotional outbursts" that go away with time. Compl. ¶ 13. Palumbo said that he was not going to discipline Palmer, but suggested that she apologize to Sheriff Stuart.

On April 29, Palmer emailed Sheriff Stuart and apologized for causing "anger and ill will." Jackola Aff. Ex. B, at 1.  Palmer acknowledged that, in her Facebook post, she had "unfairly painted law enforcement with a broad brush.  I can see now how my law enforcement friends would be offended . . . ."  Id.  She also called her post "thoughtlessly offensive" and "insulting."  Id.  Sheriff Stuart thanked Palmer for her email and said that he would "ensure that this does not establish any roadblocks for our collective future."  Id.  After this incident, Palmer continued her work.

On June 9, 2015, Palmer posted to her personal Facebook page a link to an article by Congressman Keith Ellison entitled "The Link Between Police Tactics and Economic Conditions Cannot Be Ignored."  Compl. ¶ 18; Jackola Aff. Ex. C, at 1.  Along with the link, Palmer wrote and quoted the following:

> I know I'm not supposed to talk politics anymore, but this opinion piece nails it.  Please—no comments . . . but if you like it, share it.
>
> "Working in high poverty areas doesn't excuse officers who use excessive force, but police officers are dealt an unfair hand:  communities with inadequate and unaffordable housing, few jobs and weak schools need more help than even the best-trained police service.  Police officers can't help people make ends meet at the end of the month."

Compl ¶ 18; Helling Aff. Ex. A at 1.  The article to which Palmer linked includes the following assertion:

> During nearly 250 years of slavery and 100 years of Jim
> Crow segregation, the US government and big corporations
> cut African Americans out of the economy. In the last
> 30 years, led by President Reagan and the Gingrich
> Republicans, something just as harmful happened: the
> systematic economic abandonment of black neighborhoods.

Jackola Aff. Ex. C, at 1. The article also says that "[h]arsh police tactics in black communities and a history of high rates of unemployment and poverty go hand in hand." *Id.*

On June 16, Palumbo called Palmer into his office and told her that he was firing her. He said that her work product had been excellent but gave a number of reasons for letting her go: her timekeeping, inconsistent schedule, personality fit, and excessively informal demeanor. Palmer responded that she had not before received any similar negative feedback and had been told that she could work a flexible schedule. After an hour of discussion, Palumbo suggested that they resume their meeting the next morning.

After the meeting resumed as planned, Palumbo reiterated that he would be terminating Palmer's employment and that the decision was his. Palumbo gave more reasons for firing her: that she was young and that he questioned her judgment. Palumbo specifically mentioned her Facebook posts, including the April post that had accused police officers of sanctioning homicide and that had upset Sheriff Stuart. Palmer pointed out that her Facebook page did not identify her as an employee of the

Office, but Palumbo did not change his mind about firing her.  Palumbo also said that the conversation was difficult for him because Palmer was a "young woman" and he felt like a "father" to her.  Compl. ¶ 21.

Palumbo offered Palmer the chance to resign, but she declined.  He then gave her a termination letter dated June 12.  When Palmer reminded Palumbo that he had been out of the office on June 12, Palumbo said that the letter had been drafted on June 11.  Palumbo then complimented Palmer on her work and said that he would provide a positive reference to future employers.

## II.  ANALYSIS

On a motion to dismiss, the Court must treat the facts pleaded in the complaint as true and construe those facts in the light most favorable to the plaintiff.  *See DeVries v. Driesen*, 766 F.3d 922, 923 (8th Cir. 2014).[1]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] The Court also considers public records and documents embraced by the pleadings.  Specifically, the Court considers Palmer's second Facebook post, the article to which that post linked, Palmer's job description, Palmer's email exchange with Sheriff Stuart, and the Office's social-networking policy.  The Court may consider these documents without converting this motion to dismiss into a motion for summary judgment.  *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).  No party objects to the Court's consideration of these materials or questions their authenticity.

*A. First Amendment Claim*

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To determine whether the First Amendment protects particular speech by a public employee, courts apply a three-part test. *See Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832-33 (8th Cir. 2015). First, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. "If the answer is yes, then the possibility of a First Amendment claim arises." *Id.* Second, a court must ask whether the public employer has produced evidence to show that the speech created an actual or reasonably foreseeable disruption to the employer's operations. *Anzaldua*, 793 F.3d at 833-34. If the answer is yes, then the court finally must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The First Amendment protects the employee's speech only if the employee's interests outweigh the interests of the government employer.

1. Matter of public concern

Palmer's Facebook posts address numerous matters of public concern. Moreover, Palmer did not speak about those matters in her professional capacity. Instead, she spoke about them as a private citizen on her personal Facebook page.

2. Disruption

Palmer had the right to speak as a private citizen on matters of public concern unless her Facebook posts created actual or reasonably foreseeable[2] disruption to the Office. According to the facts alleged in the complaint, Palmer's first post created an actual disruption. Palumbo's job is, in part, to give confidential legal advice to Sheriff Stuart and his deputies, and to represent them in litigation; it is extremely important that any client have full trust and confidence in his attorney. Palmer's post accusing Baltimore police officers of sanctioning homicide and making excuses for rioters who were endangering those same officers created a rift between Sheriff Stuart and the

---

[2]Palmer contends that a public employer must wait until the speech of a public employee *actually* disrupts the workplace before firing the employee; it is not sufficient, she argues, that the public employer reasonably anticipates that the workplace will be disrupted if the employee is not fired. The Eighth Circuit has issued inconsistent opinions on this issue, sometimes saying that proof of actual disruption is necessary (*see, e.g.*, *Belk v. City of Eldon*, 228 F.3d 872, 881 (8th Cir. 2000)), and sometimes saying that proof of reasonably foreseeable disruption is sufficient (*see, e.g.*, *Hemminghaus v. Missouri*, 756 F.3d 1100, 1112 (8th Cir. 2014)). Just last year, the Eighth Circuit acknowledged the conflict between these two lines of cases and resolved that conflict in favor of the line of cases holding that a public employer does not have to wait for actual disruption to the workplace, but may instead fire the employee based on a reasonable prediction of disruption. *Anzaldua*, 793 F.3d at 834 n.3.

Office.  Indeed, it caused Sheriff Stuart to call Palumbo and tell him that Palmer—the very person who was supposed to act as the liaison between Palumbo and Sheriff Stuart—was no longer welcome in Sheriff Stuart's office.  That was a major disruption.

Palmer herself recognized this.  In her email to Sheriff Stuart, she admitted that her first Facebook post caused "damage," "anger," and "ill will."  Jackola Aff. Ex. B, at 1.  She also said that her "insulting commentary" was "thoughtlessly offensive."  *Id.*  She volunteered "to try to repair some of the damage" her post had caused.  *Id.*

Palmer's second post also created an actual disruption of the relationship between Palmer and Palumbo and a reasonably foreseeable disruption between the Office and Sheriff Stuart and his deputies.  After expressly acknowledging that she was "not supposed to talk politics anymore," Palmer defied her boss's instructions and "talked politics"—endorsing an article that criticized police officers such as those whom Palumbo represents and the political party to which many thousands of Palumbo's constituents belong.  At a minimum, Palmer showed terrible judgment.

### 3.  Balance of interests

Because Palmer's Facebook posts caused actual and reasonably foreseeable disruption, the Court weighs the Office's interest in operating efficiently against Palmer's interest in commenting on matters of public concern.  *Pickering*, 391 U.S. at 568.  In performing this *Pickering* balance, the Court considers "six interrelated factors":

> (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Anzaldua*, 793 F.3d at 835. "[T]he *Pickering* balance is flexible and the weight to be given to any factor varies depending on the circumstances of the case." *Germann v. City of Kansas City*, 776 F.2d 761, 764 (8th Cir. 1985).

There is little to be found on Palmer's side of the equation. Palmer did speak as a private citizen, and she spoke on her own time and on her own Facebook page. But the degree of public interest in her speech was minimal. Palmer does not have any particular expertise on the issues on which she was commenting, nor was she acting as a whistleblower or contributing previously unknown facts or insights to the public debate. She was simply adding her views to the views of countless others.

There is, by contrast, a great deal to be found on Palumbo's side of the equation. The Court cannot emphasize enough the unique nature of Palumbo's and Palmer's positions. Palumbo was elected by the people of Anoka County to serve as the County's chief legal representative. It was critical that *all* citizens of the County—including Republicans—have confidence in his judgment, fairness, and integrity. Among Palumbo's most important responsibilities were to give confidential legal advice to Sheriff Stuart and his deputies; to represent Sheriff Stuart and his

deputies when they were sued; and to decide whether to prosecute criminal cases submitted by law-enforcement officers. Thus, it was critical that all law-enforcement officers working in and with Anoka County have the utmost confidence in Palumbo.

Palmer's job was also unique. She was not employed as a clerk or custodian; she was employed as Palumbo's spokesperson. She represented Palumbo in the community, and she served as a liaison between Palumbo and law-enforcement officers. It was extremely important that Palumbo be able to trust Palmer, that Palmer have a good relationship with law-enforcement officers and the citizens of Anoka County, and that Palmer display good judgment. After all, if a clerk or custodian posted inflammatory remarks on her personal Facebook page, it is highly unlikely that anyone would associate those remarks with Palumbo or that those remarks would affect the clerk's or custodian's ability to do her job. That was not true with respect to posts by Palumbo's own spokesperson.

In short, given that Palmer's job was to act as a liaison between her boss and those he served, "the need for harmony in the work place" was obviously high. *Anzaldua*, 793 F.3d at 835. Just as obviously, Palmer could not do her job unless she had "a close working relationship" with Palumbo, *id.*; indeed, few employment relationships require more trust than the relationship between an elected official and his spokesperson. And as already explained, Palmer's speech clearly impeded her ability

-12-

to perform her duties; Palumbo understandably lost confidence in her judgment, and he reasonably predicted that law-enforcement officers and others whom he served would be offended by her Facebook posts.

For these reasons, the *Pickering* balance comes out decidedly in defendants' favor, and Palmer's First Amendment claim must be dismissed.

### B. Supplemental Jurisdiction

Given that this lawsuit is in its infancy, and given that Palmer's sole federal claim has been dismissed, the Court declines to exercise supplemental jurisdiction over Palmer's state-law claim. *See Hervey v. Cty. of Koochiching*, 527 F.3d 711, 726 (8th Cir. 2008). That claim is dismissed without prejudice.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 7] is GRANTED.

2. Count I of the complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Count II of the complaint is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 28, 2016                                     s/Patrick J. Schiltz
                                                          Patrick J. Schiltz
                                                          United States District Judge